United States v. Nelson and Skillern. Good morning. Good morning. May it please the court. Good morning, your honors. Adil Bashir on behalf of Mr. Nelson. I'm joined here by co-defendant's attorney, Mr. Stanley Schneider. At the heart of this case is the difference between an unsuccessful business venture and a scheme to defraud. The government's theory of prosecution is that Mr. Nelson intended to sell gold that did not exist. But the evidence that it presented is that Mr. Nelson's very job was to obtain gold and that he made continuous efforts to obtain that gold. The evidence showing Mr. Nelson's attempts to obtain and deliver gold to own gold customers is impossible to reconcile with an intent to defraud. And that is really where we want to focus on the heart of this case. Because, again, the scheme to defraud as differentiated from an unsuccessful business venture is really the object of the scheme. What was the purpose of the business venture or the scheme as the government theorizes? And so they argued at their closing statement and throughout their theory of the case is that Mr. Nelson agreed with others to sell a nonexistent product. They promised gold to own gold customers, but at bottom there was no gold and they had no intent to ever deliver that gold. But the irreconcilable fact is that their entire case is based upon Mr. Nelson's missteps in obtaining that very gold and delivering that gold to own gold customers. So can I ask you a quick question? One of the more troubling facts to me, and you can explain to me why I might have this wrong, is that wasn't it Nelson who signed contracts telling people that if they showed up to the site, they could have some ore or some such? And did the ore exist? Well, that's actually a critical point I'm glad you touched upon because really that goes to what is the contract promises and own gold's customer contracts and bringing us down to this IHF contract. So I know it gets a little bit confusing, so I'll try to use clear terms. There are, from the inception of own gold, own gold customer contracts where, as Judge Newsome, you just pointed out, this promise of you can, if you want to come pick up your ore, you can come pick up your ore within seven days. Now, at that initial point, and this is not disputed by the government at trial or in its brief, there is a contract authored by Mike Skillern and given to Mr. Nelson that has own gold and IHF as a subcontractor that ensures that very same promise. And in that own gold IHF contract is that same clause. If a customer gives seven days notice, there's a seven day notice here. Now, I understand the trouble here is for understanding of the mining industry is the prospect of coming to pick up your ore is actually a rather curious prospect. You would need something in the order of several dump trucks and several tons to be able to do so. So that certainly is what the government's case is. A promise such as that perhaps could have been inducement. But really the inference, and since the discussion this morning is really about the reasonableness of the jury's inference. So we just take that at point one, the inception of own gold. What is Mr. Nelson's job? Mr. Nelson's job, he's hired in to manage this organization. But he's really a subordinate. His job is to be this facilitator. And he's given, what is his infrastructure? Let me ask the question this way. Did not Nelson make representations about own gold's progress even after he knew that the assurances were false? Well, I want to be technical in that answer because the assurances of, if Your Honor is talking about the assurances or the promises. Well, he represented to customers, for example, did he not, in July of 2012 that own gold, quote, was successfully operating, processing, and producing and would be able to timely fulfill its contracts. Did he not make those representations? You're absolutely correct. All right. Then let me ask you, having made those representations, in July of 12, was he not aware from having gone to the mine in April of 12 that there was no detectable gold found there? Yes, Your Honor, but that's a critical period. And it actually goes back to this again. What the government is theorizing is, and they're trying to find a place where Mr. Nelson has formed this intent. Forget what the government is theorizing. I'm asking just a very specific granular question. He made representations in July that this operation, own gold, was successfully operating, processing, and producing gold and that they would be able to timely fulfill the contracts. Yet he knew months before he made that representation that there was no gold being mined in Nevada at that site. Well, that is the technical difference because months before he had the IHF contract who was responsible. July comes and there is this default by IHF, but it's Mr. Nelson's direction to shift efforts to Mr. Spooner. It's Mr. Nelson's efforts to shift efforts to Nevada. And as he understands it and as he's being told by corporate counsel and he's being told by others, how do we fulfill these contracts? That is what the evidence shows in this case. How do we get the gold? We need to shift focus to Montana. We need to obtain the gold. You're absolutely correct that the representations, and there's no shying away. There are misrepresentations made, but to borrow from language earlier said, those are a necessary but not sufficient basis alone because the question still is, are those representations in furtherance of to cheat the customers? I see my time is up. I can just finish the point. Sure. Are those representations to cheat the customers or as to Mr. Nelson, are those misrepresentations, as Mr. Lewis is telling him, to buy time in order to meet production? Thank you very much. Thank you, Ryan. Good morning. May it please the Court. I'm Stanley Schneider. I represent Michael Skillen. I want to change the focus briefly because the Supreme Court's decision in Getters and this Court's in bond decision in Roy mandate that Mr. Skillen's conviction be reversed based on the District Court's order that he not talk to me during an overnight recess. The District Court manifested order or ordered Mr. Skillen at the first recess during his direct testimony not to speak to me. In response to a direct question by Mr. Skillen, may I speak to my attorney? And she said, you may not. My request to speak to Mr. Skillen was in response to the Court's earlier order. Isn't it correct that when the Court made that decision that there was no objection by counsel to what the Court told counsel? Well, Your Honor, I don't think I had to object when I made the request and said, Judge, may I speak to my attorney, my client? And she said, no. Actually, she said, yes, you could speak to him about the weather. But case law speaks to whether or not there was an objection made at that time or not. Actually, Your Honor, if you look at Gators, the word I object is nowhere in the Supreme Court's decision that counsel objected. The discussion and request to speak manifested my desire to speak to my attorney. I don't have to object to a court. If I make a request to a District Court judge saying, may I do something, and the Court says no, the Court's order, I have to obey the order. Courts have held on review, and not just one court, but many courts have held on review that one of the things that you look for is whether or not an objection was made at the time that the Court gave the instruction or not. And let's assume in this case that there was error. Let's just assume that there was error. The standard by which this Court should review the error is not well settled. Well, I disagree, Your Honor, in that regard. In the en banc decision in Roy, Chief Justice Karnes wrote, Gators was one of the line of decisions presuming prejudice where a defense attorney was prevented from or impeded in rendering assistance of counsel to his client because of an unconstitutional statute or court order. But didn't here – I mean didn't you get what you asked for? You said, can I speak to my client about something other than his testimony? And the Court said, fine, that's what you want. And if you look at the District Court's opinion, the D.C. Circuit's opinion in the United States v. Mudd, talking about procedure, talking about any limitation on the right to consult with an attorney, talking about scheduling is not a substantive issue. The Supreme Court has made clear that when you impede talking about substantive issues, what we were talking about – talking about scheduling is not a substantive issue. This has impacted the very heart of our case because – But you don't deny just the premise of my question that you asked to speak to him about something other than his testimony. Your Honor, first I asked to speak to him. The District Court said about the whether, what about? And I said, how about scheduling of witnesses? And she said, fine, you can talk about scheduling of witnesses, but nothing that impacts his testimony or his – or she put a limitation on what I could talk to him about. Let me ask you, at that point the call acquiended, didn't it? Yes, Your Honor. You didn't say to the judge in words of substance – Excuse me? You didn't say to the court, I want to speak to my client. I thought – Let me finish. Untrammeled in any way by any order from you, I've got a right to consult. No, I didn't say that. And I want to speak to them. I did not further pursue it after the court gave me the firm instruction. At any point did you ever say to the judge in words of substance, this has affected me, this has hurt me, I can't – to provide an appropriate defense, I really have got to speak to him and I've got an absolute right to counsel with my client? No, I did not, Your Honor. The only reason I'm asking it is they suggest that you actually invited the error. Maybe that's true, maybe it isn't. But it sure would have been a whole lot more helpful if you flagged the issue for the court. You said, I want to speak about X. The court said, okay, but not about Y. You said nothing and there it went and then the next day the issue came up again and the court probably realizing that it really ought not to be interfering with your discussion with your client left you free to talk about anything. Judge, the – Do I have that recitation inaccurate? No, Your Honor. Every witness in this case at every recess, every overnight recess was instructed not to talk to counsel or not talk to anyone about their testimony. Right, but never not to talk to counsel. I mean, that would be – Not talk to the state government's witnesses or defense counsel about their testimony or their impending testimony. Those were the instructions at every recess in this trial. At the first recess, Mr. Skillern said, may I speak to my attorney? The court said no, and that's cited in page 2 in our reply brief. At the end of the day, the court had made its position very clear throughout the trial. The next day, when the government wanted to speak about the cross-examination of Ed Lewis, which was the heart of the defense in this case, was Mr. Skillern's attorney, and the court, one, instructed Mr. Skillern not to talk to me during that recess and excused him from the courtroom. Again, the court manifested its desire that nothing interfere with Mr. Skillern's testimony. And then the court recognized that night that the next day, Mr. Skillern's lawyer was going to be testifying. And that night, I had documents. This was a document-intensive trial. I don't think I've ever introduced into evidence hundreds of emails describing the relationship between Ed Lewis and Mike Skillern and how that impacted the business. And that decision, in the order of the court, as if you look at the D.C. Circuit's decision in Mudd, the Fifth Circuit's decision in the United States v. Johnson, it's a case I didn't cite in my brief, but I'll provide the cite to the court. The request to speak manifested the desire of an attorney to speak. Just by asking the question, may I speak? I understand. And that's what I was doing. And the Supreme Court in Perry and Gieters says that is presumed error during an overnight recess. And that's what we have here, an overnight recess where the heart of the defense of Mr. Skillern was his testimony and, more importantly, his lawyer's testimony that was coming at the end of the trial to show that he was relying on the advice of counsel. I think we have it. Thank you very much, counsel. Mr. Lieberman. Good morning. May it please the Court, Dave Lieberman for the United States. Let me follow opposing counsel's sequence and start with the sufficiency claim first, and then I'll return to the Sixth Amendment claim. Why don't you start with the Sixth Amendment claim first? And let me ask the question this way. Would it not be error for a judge to prevent a defendant from speaking to his lawyer on an overnight break about the case? Period. Unambiguous. He's got a right to speak with his lawyer. His lawyer has got a right to speak with him, and the court has no business interfering or impeding that. Isn't that right? That restriction would be error, yes. That didn't – Didn't that happen in some measure in this case? No, for three reasons. First, the government's contention is this was invited error. If the court studies the transcript, Documentary 431-9, starting at page 206, Mr. Skillern finishes his testimony for the day, he steps off the witness stand, and there is no instruction, admonition, restriction imposed by the judge. Well, the colloquy is short, sweet, and, Your Honor, may I speak to Mr. Skillern about matters other than his testimony this evening? That's correct. That was Mr. Skillern's testimony. The court, yes. Defense counsel continues and says that may come up. The court, you can talk about the weather. What do you mean other than may come up? Not his testimony or his impending testimony. Defense counsel, right, Your Honor, but maybe witness problems or things like that. The court, yes, anything about the proceeding and so forth, who's coming, who is not coming, that's fine, but just not his testimony or his impending testimony. Defense counsel, fine, Your Honor. That's the whole colloquy. That's correct, and in the government's view of the colloquy, the start of it is the most crucial point, page 208. Your Honor, this is defense counsel, may I speak to Mr. Skillern about matters other than his testimony this evening that may come up? That's the critical point because counsel is asking for permission to speak about everything else other than the testimony, and then the statements or the response from the district court. Yes, anything about the proceeding, who's coming, who's not coming, but just not his testimony or impending testimony. Defense counsel proposed the framework. The district court accepted the framework. Could the judge impede him from speaking about his testimony or impending testimony? The judge could not unilaterally impose that restriction. In no way could a judge say, lawyer can't speak to his client about what he's going to say the next day. I think that that's clear from the Getter's decision. This Court had a similar case recently, Cavalio. But the point here is, had counsel not interjected, Mr. Skillern would have stepped off the stand with no restriction. It is defense counsel offering up the offer. Can I speak to him? Well, something must have motivated him to feel that he had to bring it to the attention of the judge. You talk about experienced counsel said to the court, may I speak to Skillern about matters other than his testimony? Admittedly, he didn't want to speak. He said, I'm not talking about the testimony. So it went off on a different curve. But he was troubled enough to want to flag the issue for the district court. I don't know why defense counsel flagged that issue. But the way that counsel flagged it, it was, can I speak about anything other than the testimony? That was the offer. The district court said yes. So the district court's comment was gratuitous, not his testimony, because he wasn't seeking to speak to him about his testimony. That's as simple as that. I think the district court was responding, yes, that's fine with me. And that is invited error, and appellate review is waived. Now, if the court disagrees or is unsure, this claim fails under the Crutchfield rule, because a majority of this court in the en banc decision in Crutchfield said that in this circumstance, a defendant cannot demonstrate a deprivation of this right to counsel during a trial recess, absent one of two things, an on-the-record desire to consult about the prohibited subject matter, or alternatively, an objection on the record. And there's no dispute there was no objection. And there's nothing in that colloquy either where Mr. Skillern or defense counsel is saying, I want to speak about this matter that's off limits. It was actually quite the opposite for the reasons that I just stated. Counsel said, I took that off the table. And the Crutchfield rule, as we pointed out in our brief, this is not novel. It's been adopted by multiple other circuits. It was applied in the exact same circumstance by this court in the Jubel case. That's an overnight recess. Jubel is an unpublished decision, so it's persuasive only, but we think it's correct. And in Getters and all the other cases opposing counsel's sites, there was an objection on the record, or the defendant or counsel makes an express statement to the district court conveying the message, I want to speak to my client about this disputed subject matter. And that was not the case here. And so, yes, to your original question, Judge Marcus, there was a clear right. The question here, was there a deprivation of that right? And to show a deprivation, Mr. Skillen has to show that he wanted to meet with his counsel about this disputed subject matter, his impending testimony, and he was prevented of doing so by the admonition. And that's just not here in this record. All right. Tell us about this. Excuse me. Do you contend that, assuming that there was error, that the error was a structural error? Yes. So this court has treated this type of error as a structural error. But that doesn't mean that plain error review doesn't apply. We still walk through the… We cannot preclude this court from reviewing that issue. I disagree with that question. I'm not aware of any case where if the defense invites a particular error, the invited error doctrine doesn't apply. I'm not aware of a case that says that. Even if it is a structural error? Correct. I'm not aware of it. We are relying on the invited error doctrine as one of our arguments in this case. I'm not aware of any case or decision from this court that takes that doctrine off the table just by the… whether it's a trial error or a structural error. And for the same reason as we have, the government has advanced a plain error argument. Prong two, even if our interpretation of Crutchfield is unsettled, we think based on how this court has applied it in Jubel and how other circuits have applied it, again, in this overnight recessed circumstance involving materially identical circumstances, any error here was not plain or obvious. And then also on plain error, we've advanced a prong four argument, which in our view is still available, that the error here did not, in fact, impact the fairness, integrity, or public reputation of these proceedings. And I just want to step into the sequence a little bit. This restriction came at the end of day one. At the end of day two, Mr. Skillen is still on the stand. The district court relaxes the restriction. And at this point, client and counsel can talk about it. Still on the stand on direct, or has he already moved over to cross? I think he's moved over to cross, but there was an opportunity on the third day. He's still on the stand. He can come back on redirect and provide any more fulsome answers, explore any line of answers that he felt was not sufficiently developed or was not adequately answered on cross-examination. And so even if we get to prong four and the government doesn't think we even get close to there, the court should deny relief. But for any of those three reasons, this claim fails. Thank you. Do you want to go on to the other issue? Thank you, Your Honor. There is ample evidence that supports the defendants' convictions arising from their scheme to induce over $7 million in fraudulent gold purchases. And going to Mr. Nelson has divided up the universe into fraud at the inception, which he disputes, and then 2012. And I'll follow that order. The jury had ample evidence to conclude that there was fraud at the inception. Mr. Nelson was involved in marketing the company as a gold producer. The marketing materials proclaimed the company as having mining claims across 160 Nevada acres that were under active development. Mr. Nelson was signing all the contracts that had the clause in it that allowed any customer to pick up the ore upon notice at the mining site. Mr. Nelson's name, he was signing all of the certificates of ownership that would be sent to the customers after they signed the contract. This is September of 2011. As of that point, the company had no active mining claims, no facilities, no equipment, no gold ore to sell. So Mr. Nelson is actively involved in marketing and selling gold and gold ore that he does not have. The defense at trial was, well, I was acting in good faith, excuse me, because the company had entered a contract with a subcontractor, IHF, and they were going to mine gold and produce the gold. And there are multiple avenues by which the jury easily could have rejected that explanation of the evidence. This subcontracting relationship not disclosed to the customers. Everything disclosed to the customers paints this company as the, as, quote, having a strong record of delivering quality growth in gold. So the customers are relying on the company, not a subcontractor. Again, the customers were receiving the contracts and the certificates from the company, from Nelson, not the subcontractor. And most problematically of all, the subcontractor, IHF, did not register its first mining claim in this case until three months later in December of 2011. So we go back to September of 2001. No mining claims, no mining equipment, no gold from either the company or its sub. And that's how the jury could easily find fraud at the inception in this case. The discrepancies between how Mr. Nelson was portraying, helping to portray the company to the customers in the contracts, in the marketing materials on the certificates, and what he knew was going on internally inside the company. Selling gold that you do not have is fraud. As to the 2012 claims, the defense of trial was that I was, Mr. Nelson was relying on the advice of counsel. As we pointed out in our brief, there's a timeline problem. The Mr. Lewis, Attorney Lewis, started representing Mr. Skillern in his personal capacity in May of 2012. Did not start representing the company until September of 2012. And large chunks of the offense conduct, including some of the instances that Judge Marcus was articulated to opposing counsel, that occurs before Ed Lewis ever enters the scene as general counsel of the company. So I, government's view, it's hard to see how someone can raise an advice of counsel defense before counsel comes onto the scene. But in any event, this court has said that questions of good faith and reliance on advice of counsel, that's something that we give to the jury. That's a question of fact. And in this case, it's even more so because the good faith advice of counsel defense, excuse me, rested on the testimony of Defendant Skillern. It rested on the testimony of Attorney Lewis. And as the district court succinctly stated below, the jury had a right to reject those witness accounts. The jury had a right to disbelieve those two witnesses. And for that reason, the jury here acted reasonably in finding fraud throughout the entire fraud period. So I know there are a couple other claims that have been mentioned in the briefs by the defense counsel. I'm happy to address them or any other concerns that the court has at this time. Any questions? No, sir. Thanks very much. The government asks that the court affirm. Thank you. Mr. Bashir, you have one minute. Thank you, Your Honors. And just two brief points. One, I think it's a key distinction, and I'm glad our friends brought this up, the difference between what was represented in the marketing materials and what's in the contracts. Because, again, you're not hearing any dispute about the validity of the IHF contract. And it's a key fact in this case that at Mr. Nelson's direction, when things do go awry, accuses IHF of fraud for not fulfilling its end of the bargain. So in this business context, the representations that are made in marketing, there is no dispute that what the promises that are made in the contracts itself, and Owen Gold's customers, and as the government has represented them in its brief, there are safeguards. You either receive your gold or your money, and there's a one-year delivery date from the inception of those first original contracts. So the unreasonableness of the assumption is that Mr. Nelson knows IHF is going to default. And if I can just briefly make the second point about the advice of counsel, because this is one area where I think it might be two ships passing in the night, where it is the government's burden to prove intent to defraud. So under its theory, and the only logical way that this works is Mr. Lewis is an unindicted co-conspirator, and Mr. Nelson knows that the advice and the direction that he's saying, to grow your way out of trouble, don't stop selling, you need to keep going forward, is actually legally dubious advice. There's no evidence of that being true. It is not the case that Mr. Nelson, as a board member, necessarily needs to disclose and rely on advice. The question here is, what is the agreement? And all of the evidence is, when Mr. Lewis comes on board and IHF defaults, how do we fulfill these contracts? And Mr. Lewis, as a corporate counsel and as an attorney, is representing to Mr. Nelson, through emails and otherwise, by the government's own case, that the only way in which to fulfill these contracts is to grow your way out of trouble. Oh, and by the way, I see absolutely nothing legally dubious about this as well. The issue here and why this is insufficient evidence is because of the assumption the jury would have to draw is Mr. Nelson knows that that is somehow legally dubious advice. I think we've got your case. Thank you. Mr. Schneider, you've reserved two minutes. Yes, Your Honor. I would like to call the Court's attention to document 431-9, page 174, 175. That's the first admonishment of Mike Skillern at the first recess. And the District Court tells Mr. Skillern during the break, in response to Mr. Skillern's specific request to speak to me, that you are not at liberty to discuss your testimony, your impending testimony, with anyone including your lawyer. My question to the Court at the end of the day, that same day, is in response to the District Court's previous order. And I knew what the Court's instructions were and how the Court, after weeks in trial, was handling what the Court had said earlier. And so I had to respect the Court, and I was trying to ask the question in line with the Court. But if you thought the Court's earlier injunction was error, as even the government concedes it would have been, then wasn't it your obligation not to just go along but to say, Your Honor, no, no, no, you can't do that. I thought at that point the Supreme Court and Perry had said you could keep a client from speaking to his attorney during a short recess. That was the law at the time of trial. But if you know at that time and you think at that time that the Court is committing an error, isn't it your responsibility to tell the Court, Your Honor, I respectfully disagree? At that point I was asking for permission from the Court to speak to the Court, to my client. And the Court said no. I did not object at that point. I made the specific request to manifest my client's desire to speak to me. And the next day it continued. Ed Lewis was the crux of our defense. His preparation of Ed Lewis and the defense of the Vice Counsel was crucial, and the presentation of Mr. Skillern was crucial. Based upon this being structural error, the Court's instructions, and the exclusion of Mr. Skillern during trial from the courtroom, I believe requires reversal of this conviction. Thank you. Thank you, counsel. Thank you all for your efforts.